**IN THE DISTRICT COURT OF THE UNITED STATES FOR THE**

**MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **)** |
| | **) CRIMINAL ACTION NO.** |
| **v.** | **) 2:17cr221-MHT** |
| | **) (WO)** |
| **BRANDON ANTHONY JOHNSON** | **)** |

### OPINION

**Defendant Brandon Anthony Johnson pled guilty to one count of conspiracy to distribute, etc., 500 grams or more of methamphetamine and one count of actually distributing, etc., more than 500 grams of a mixture containing methamphetamine. *See* 21 U.S.C. §§ 841(a)(1) and 846. He essentially served as middleman in these crimes, arranging for a package containing 900.1 grams of methamphetamine mixture to be mailed from where he was in California to a co-defendant in Alabama.**

**Johnson avoided an otherwise applicable 10-year mandatory-minimum sentence because he qualified for "safety valve" relief, as expanded by the First Step Act of 2018, Pub. L. No. 115-391, 132 Stat. 5194, § 402 (2018). With the mandatory minimum off the table, the**

government advocated for a prison sentence within his United States Sentencing Guidelines range of 108 to 135 months. Johnson, on the other hand, sought a downward variance based both on the policy objections to the methamphetamine guidelines that district courts have increasingly raised in recent years, as well as his personal history and characteristics. He proposed a 48-month sentence.

As orally explained at his sentencing and elaborated below, the court granted Johnson's motion for a downward variance based on the policy disagreements with the methamphetamine guidelines that this court shares with a growing number of district courts across the country. Specifically, sentence lengths are inordinately driven by the quantity and purity of the methamphetamine involved in the offense. Both quantity and purity are unreliable proxies for the offender's role in the crime and his culpability. In fact, the guidelines do not give enough weight to the offender's role, which better indicates culpability.

Simply put, the methamphetamine guidelines overemphasize quantity and purity, and underemphasize criminal role. Furthermore, the court's authority to vary downward based on these objections was at its apex, given that the methamphetamine guidelines are not the result of the Sentencing Commission's empirical research or expertise.

The government did not dispute any of these criticisms of the methamphetamine guidelines; instead, it contended that those critiques did not apply to Johnson's particular circumstances. The court disagrees. The policy flaws directly and instructively impacted Johnson, who had a relatively low-level role in the crime, yet still confronted a high Guidelines range due to the quantity and purity of the methamphetamine involved.

Ultimately, the court 'varied' downward to impose a 64-month prison sentence, to be followed by three years of supervised release.

## I. BACKGROUND

**A federal grand jury returned a superseding indictment charging Johnson with one count of conspiracy (that is, conspiracy to distribute and possess with intent to distribute 500 grams or more of methamphetamine), and one count of distribution (that is, distributing and possessing with intent to distribute more than 500 grams of a mixture containing methamphetamine). He pled guilty to both counts.**

**The United States Probation Office's Presentence Investigation Report (PSR) found a base-offense level of 34 applied to Johnson's offenses based on the quantity and purity of methamphetamine. Specifically, the offenses involved two packets of methamphetamine mixture contained in a single package. The first packet weighed 445.72 grams, and had 70 % purity, resulting in 312 grams of "actual" methamphetamine. United States Sentencing Commission, Guidelines Manual § 2D1.1(c), Note B (Nov. 2018) (USSG).[1] The second weighed 455.38 grams and had**

---

**1. As discussed below, USSG § 2D1.1(c), Note B explains that "actual" methamphetamine refers "to the**

**4**

73 % purity, resulting in 332.43 grams of actual methamphetamine. The total weight of actual methamphetamine was thus 644.43 grams, triggering a base-offense level of 34. *See* USSG § 2D1.1(C)(3). Probation subtracted three levels for Johnson's acceptance of responsibility, *see* USSG § 3E1.1(a)-(b), and determined that his criminal-history category was II. The total offense level of 31 and criminal-history category of II yielded a Guidelines range of 121 to 151 months of imprisonment. Probation recommended a term of 136 months--16 months higher than the mandatory minimum 120-month sentence for counts one and two under 21 U.S.C. *Trejo,*§ 841(b)(1)(A).

Johnson contended that he qualified for the "safety valve" under 18 U.S.C. § 3553(f), as amended by the First Step Act, and that he was therefore not subject to a mandatory-minimum sentence. Johnson Sentencing Memorandum (doc. no. 169) at 2-4. In addition, he

_____

weight of the controlled substance, itself, contained in the mixture." For instance, a mixture weighing 10 grams containing methamphetamine at 50 % purity contains five grams of actual methamphetamine. *See id.*

requested a downward variance based on policy disagreements with the methamphetamine guidelines, as well as his history and personal characteristics. These personal circumstances included that both his parents passed away soon after he committed these offenses and that he played college football and hopes to coach after serving his sentence.

The court held a sentencing hearing, during which it determined that Johnson qualified for the safety valve.[2] Applying the safety valve decreased Probation's initial

_____

2. The government conceded that Johnson met all five of the requirements except for the "tell-all" provision of 18 U.S.C. § 3553(f)(5). After hearing Johnson's testimony *in camera*, the court determined that he satisfied the "tell-all" provision and was thus entitled to relief. It bears noting that Johnson qualified for relief only because of the recently enacted First Step Act, which raised the maximum allowable criminal-history points from one to four, excluding any criminal-history points resulting from a one-point offense. (Johnson had two points.) The First Step Act states that this amendment shall apply to only a "conviction entered" on or after the date the statute was enacted, December 21, 2018. The term "conviction entered" is not defined in the Guidelines or by statute. It could potentially mean the day the plea is accepted, or the date of sentencing. This court did not reach this issue, however, because the government conceded that Johnson met the criminal-history requirement for safety-valve relief.

calculation of a 31 total offense level by two levels, leaving it at 29. *See* USSG § 2D1.1(b)(18). However, because the government informed the court that, in contrast to what Probation had anticipated, it would not move for the reduction by athird level for acceptance of responsibility pursuant to USSG § 3E1.1(b), the total offense level increased back up to 30. Accordingly, Johnson's offense level was 30 and criminal-history category remained II, producing a Guidelines range of 108 to 135 months. The court adjourned the hearing to allow the government to respond to Johnson's policy arguments.

At the second hearing, the government did not dispute the substance of Johnson's policy criticisms. Rather, it argued that those criticisms did not apply to him in light of his role in the offenses. Accordingly, the court inquired further into the parties' view of Johnson's role. Both parties agreed that the criminal conduct for which he was being sentenced involved essentially arranging for the mailing of 900.1 grams of methamphetamine from California to his co-defendant Roger

**Dale Walker, in Elmore County, Alabama. And initially,**

**based on this conduct, both parties also agreed that**

**Johnson essentially acted as a 'mule' in the transaction.**

**Ultimately, the court found that Johnson's role was**

**somewhere between a courier and broker or middleman.[3]**

## II. DISCUSSION

**Sentencing courts may vary from the applicable**

**Guidelines ranges based on their disagreement with a**

**Guidelines policy.** *See United States v. Kimbrough*, **552**

---

**3. This finding was based on the government's concession about the extent of Johnson's role in the conduct for which he was being sentenced, as well as his testimony** *in camera* **on January 9, 2019, which the court found to be credible. Specifically, Johnson testified that he and Roger Dale Walker had met a few months before the drug transaction at a hip-hop event in California; that Walker had said he was looking for a methamphetamine connection, and Johnson agreed to help him find someone; that Walker provided him with money to purchase the methamphetamine from a source in California; that, once Johnson identified the source, he provided the source with Walker's address and verified the contents of the drug shipment before the source's associate put it in the mail; and that Johnson received $ 500 from the source, and expected to receive a cut from Walker. The court did not credit the postal inspector memorandums summarizing interviews with Johnson's co-defendants, because the hearsay statements were second- and third-hand and not reliable.**

**8**

U.S. 85, 109-10 (2007); *see also United States v. Irey*, 612 F.3d 1160, 1212 (11th Cir. 2010) (en banc) ("*Kimbrough* allows a district court to vary from the Guidelines based solely on its judgement that the polices behind the guidelines are wrong."); *United States v. Flores-Perez*, 2018 WL 4293305, at \*4 (11th Cir. 2018) (unpublished) (noting that *Kimbrough* "'empowered' district courts with discretion to vary downward based on a policy disagreement with the applicable guidelines"); *see also Pepper v. United States*, 562 U.S. 476, 501 (2011) ("[A] district court may in appropriate cases impose a non-Guidelines sentence based on a disagreement with the Commission's views.").

Johnson makes two overarching policy arguments for a downward variance. First, he contends, the methamphetamine guidelines are not based on the Sentencing Commission's empirical research or expertise, but rather are the vestige of mandatory-minimum sentencing laws. Second, those guidelines impose unduly harsh sentences premised on the mistaken idea that the

higher the quantity and purity of drugs involved in the crime, the higher the defendant's position in the drug trade. The court will address each argument in turn.

## A. Lack of Empirical Support

In *Kimbrough*, the Supreme Court made clear that a sentencing court may vary downward at least in part based on the lack of empirical support underpinning the applicable guidelines. 552 U.S. at 109-110. There, the Court upheld the district court's decision to vary downward because of its policy disagreement with the crack-versus-powder-cocaine sentencing disparity enshrined in USSG § 2D1.1, the guideline for drug-trafficking crimes that is also at issue here. *See Kimbrough*, 552 U.S. at 91. As the Court explained, the Commission generally developed the Guidelines "using an empirical approach based on data about past sentencing practices." *Id.* at 96.[4] Crucially, however, the

---

4. *See also Gall v. United States*, 552 U.S. 38, 46 (2007) (noting that the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual

Commission "did not use this empirical approach in developing the Guidelines sentences for drug-trafficking offenses." *Id*. Instead, the Commission formulated Guideline 2D1.1(c) based on the "weight-driven scheme" in the Anti-Drug Abuse Act of 1986 (1986 Act), Pub. L. No. 99-570, 100 Stat. 3207 (1986). *Id*. Consequently, Guideline 2D1.1(c) does "not exemplify the Commission's exercise of its characteristic institutional role" to "base its determinations on empirical data and national experience." *Id*. at 109 (internal quotation marks omitted). The Commission's deviation from its characteristic institutional role in creating Guideline 2D1.1(c) afforded the district court with greater leeway to vary from that guideline. *See id*. at 109-110.

Several district courts have granted variances at least in part because the drug-trafficking guidelines are not rooted in empirical evidence. For example, in *United*

sentencing decisions"); USSG § 1A.1, intro. comment., pt. A ¶ 3 (explaining that the Commission analyzed data drawn from 10,000 presentence investigations).

11

*States v. Diaz*, the court placed "almost no weight" on the Guidelines range for the defendant middleman in a heroin sale, given that "Guidelines ranges for drug trafficking offenses are not based on empirical data, Commission expertise, or," as discussed later in this opinion, "the actual culpability of defendants." 2013 WL 322243, at \*1 (E.D.N.Y. Jan. 28, 2013) (Gleeson, J.). The court reasoned, based on *Kimbrough*, that a "district court's authority to vary from the applicable Guidelines range due to a policy disagreement is at its greatest when the offense Guideline at issue is not the product of the Commission's empirical analysis and technical expertise." *Id.* at 3.

Similarly, in *United States v. Hayes*, Judge Bennett concluded that the "methamphetamine Guidelines are entitled to less deference than those Guidelines that were based on the Commission's exercise of institutional expertise and empirical analysis." 948 F. Supp. 2d 1009, 1027 (N.D. Iowa 2013) (examining the history of the methamphetamine guidelines, which evolved through a

12

series of amendments beginning with the establishment of
mandatory minimums for methamphetamine trafficking
offenses in the Anti-Drug Abuse Act of 1988, Pub. L. No.
100-690, 102 Stat. 4181 (1988));[5] *see also United States
v. Castellanos*, 2008 WL 5423858, at *7 (D. Neb. Dec. 29,
2008) (Bataillon, C.J.) (holding in a methamphetamine-
sentencing case that, "because the drug offense
Guidelines were promulgated pursuant to Congressional
directive rather than by application of the Sentencing
Commission's unique area of expertise, the court affords
them less deference than it would to empirically-grounded
Guidelines"); *United States v. Ibarra-Sandoval*, 265 F.
Supp. 3d 1249, 1252 (D.N.M. 2017) (Brack, J.) (varying
downward in part because the "methamphetamine Guidelines
are not based on empirical data").

In another opinion, *United States v. Nawanna,* Judge
Bennett specifically found that the methamphetamine

_____

    5. The initial Guidelines did not list
methamphetamine in the drug table because that drug was
not subject to the 1986 Act. *See id.* at 1023. Instead,
methamphetamine was originally listed in the "Drug
Equivalency Tables" as a Schedule II stimulant with an
equivalency equal to twice that of cocaine. *Id.*

guidelines' 10-to-1 ratio between methamphetamine mixture and actual methamphetamine was not based on empirical analysis. *See* 321 F. Supp. 3d 943, 950-51 (N.D. Iowa 2018). The lack of evidence supporting the ratio served to justify his downward variance on policy grounds. *Id*.

Consistent with *Kimbrough* and the district court opinions discussed above, reduced deference to the methamphetamine guidelines is due here because they are not the result of empirical study and expert analysis. Because the Commission did not exercise "its characteristic institutional role" in developing the methamphetamine guidelines, *Kimbrough*, 552 U.S. at 109, this court has greater latitude to make a downward variance based on policy disagreements with them, *see Diaz*, 2013 WL 322243, at *3. The opinion will now address those disagreements.

**B. Quantity and Purity**

**i. Quantity**

USSG § 2D1.1(c) sets forth "a drug quantity table based on drug type and weight to set base offense levels for drug trafficking offenses." *Kimbrough*, 552 U.S. at 96. The greater the quantity of drugs, the higher the base-offense level, and thus sentencing range. This quantity-based approach originated in the 1986 Act, which "created a two-tiered scheme of five- and ten-year mandatory minimum sentences for drug manufacturing and distribution offenses." *Id.* at 95. In the 1986 Act, "Congress sought to link the ten-year mandatory minimum trafficking prison term to major drug dealers and to link the five-year minimum term to serious traffickers." *Id.* (internal quotation marks omitted). The 1986 Act used the weight (and thus quantity) of the drugs involved in the offenses "as the sole proxy to identify 'major' and 'serious' dealers." *Id.*[6] Even though the statute

---

6. "Congress apparently linked five-year penalties to amounts that were indicative of managers of the retail traffic, while amounts linked to ten-year penalties were believed generally indicative of manufacturers or the

specified only the two quantities of each drug that would trigger the mandatory sentences, the Commission decided to extend the quantity-based approach across the full range of possible drug quantities. *See Kimbrough*, 552 U.S. at 97.

At the time the Commission adopted the Guidelines, it failed to explain why it decided to implement the quantity-based approach for all trafficking offenses, and to thereby "greatly elevate[]" the "importance of quantity" as "compared to other offense characteristics." United States Sentencing Commission, *Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System is Achieving the Goals of Sentencing Reform*, at 49-50 (2004), https://www.ussc.gov/sites/default/files/pdf/research-

---

heads of organizations." United States Sentencing Commission, *Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System is Achieving the Goals of Sentencing Reform*, at 48 (2004), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-projects-and-surveys/miscellaneous/15-year-study/15_year_study_full.pdf (internal quotation marks omitted).

and-publications/research-projects-and-

surveys/miscellaneous/15-

year-study/15_year_study_full.pdf (hereafter *Fifteen Years of Guidelines Sentencing*); *see also* Kate Stith & José A. Cabranes, *Fear of Judging: Sentencing Guidelines in the Federal Courts* 69 (1998) (asserting that the Commission had "nowhere stated, much less explained, why these quantifiable differences in harm caused are *appropriate* measurements of the extent of individual culpability").[7] In 2008, more than 20 years after the Guidelines were originally promulgated, Judge Gertner wrote that the Commission still had not "explained how drug quantity is meant to measure offense seriousness, and significantly, how it correlates with the purposes

---

7. Judge Cabranes and Professor Stith explained that the "most common specific offense characteristic found in the Sentencing Guidelines is *quantity*--with the result that the severity of a sentence is heavily dependent on quantifiable factors such as the amount of drugs in a drug conspiracy, the amount of money stolen in a bank robbery, or the number of unlawful aliens harbored in an illegal immigration scheme." *Id.* at 68-69. The "[q]uantification of harm" was attractive to the Commission because it allowed the agency "to distinguish among defendants on the basis of apparently objective and precisely measured criteria." *Id.* at 69.

17

of sentencing under 18 U.S.C. § 3553(a)." *United States v. Cabrera*, 567 F. Supp. 2d 271, 276 (D. Mass 2008). "The only explanation, which one has to infer from the Guidelines, is that drug quantity is somehow a proxy for culpability." *Id.*[8]

Soon after the drug-trafficking guidelines' enactment, "[s]ome observers doubted that drug quantity was a reliable measure of offense seriousness," *Fifteen Years of Guidelines Sentencing* at 50, especially "for the culpability of low-level offenders, who may have contact with significant amounts of drugs, but who do not share in the profits or decision-making," *id.* (citing Catherine M. Goodwin, *Sentencing Narcotics Cases Where Drug Amount*

_____

8. The Sentencing Commission reported to Congress in 2004 that its unexplained decision to adopt the quantity-based approach for drug trafficking offenses had more of a "profound impact on the federal prison population" than any other decision by the Commission, as it "had the effect of increasing prison terms far above what had been typical in past practice." *Fifteen Years of Guidelines Sentencing*, at 49; *see also Diaz*, 2013 WL 322243, at *10 ("In less than a decade, from 1985 to 1991, the length of federal drug trafficking sentences increased by over two-and-a-half times.").

*is a Poor Indicator of Relative Culpability*, **4 Fed. Sentencing Rep. 226 (1992); Steven B. Wasserman,** *Toward Sentencing Reform for Drug Couriers*, **61 Brook. L. Rev. 643 (1995)). Given "the problems with relying on drug type and quantity to measure the seriousness" of drug crimes, critics "called for a fundamental re-examination of the role of quantity under the guidelines."** *Id.* **at 52 (citing Frank O. Bowman III,** *The Quality of Mercy Must Be Restrained, and Other Lessons in Learning to Love the Federal Sentencing Guidelines*, **1996 Wis. L. Rev. 679 (1996); Jonathan P. Caulkins et al.,** *Mandatory Minimum Drug Sentences: Throwing Away the Key or the Taxpayers' Money?* **(RAND 1997)).**

**More recently, over the past decade, courts have increasingly recognized that "drug quantity is a poor proxy for culpability."** *Diaz*, **2013 WL 322243, at \*13;** *see also Cabrera*, **567 F. Supp. 2d at 276-77;** *Hayes*, **948 F. Supp. 2d at 1027-28;** *United States v. Woody*, **2010 WL 2884918, at \*9 (D. Neb. July 20, 2010) (Bataillon, C.J.) (stating that in drug conspiracy cases, quantity "is not**

always a trustworthy measure of the culpability of an individual defendant"). Judge Gleeson persuasively explained this point in *Diaz*: "Drug quantity is not irrelevant in assessing a drug trafficking defendant's culpability, and there is nothing inherently wrong with the Guidelines taking drug quantity into account. If all else is equal, a dealer who sells 50 kilograms of heroin inflicts more harm on society, and deserves greater punishment, than one who sells one kilogram." 2013 WL 322243, at *12. However, "two drug trafficking cases are rarely alike in all respects except quantity." *Id.* Many "factors distinguish one drug offender's culpability from another," including his compensation, whether he had a proprietary interest in the drugs, the length of his involvement in the trafficking, and his reasons for getting involved and for stopping. *Id.* Perhaps above all else, the most important factor distinguishing the culpability of defendants is their role in the crime.

This court shares Judge Gleeson's view that the offender's role in the crime is more useful for

determining culpability than the quantity of drugs involved. *See id.* at 13. As he explained, the "managers and leaders of a drug organization actively plan the organization's activities, plot to increase its profits, and recruit its members." *Id.* Consequently, they are more likely to initiate drug-related crimes and increase their scale. *See id.* A low-level dealer or courier, by contrast, "is easily replaceable and does little to advance the overall drug organization." *Id.; see also* United States Sentencing Commission, *2011 Report to the Congress: Mandatory Minimum Penalties in the Federal Criminal Justice System*, at 166 (2011) (hereafter "*Mandatory Minimum Report*") ("offenders at higher levels of the drug distribution chain are presumed to be more culpable based on their greater responsibilities and higher levels of authority"). To draw on the popular imagination, it is the Pablo Escobars, Stringer Bells, Tony Montanas, and Walter Whites of the world who bear the greatest culpability, not the street peddlers, middlemen, and mules, regardless of the quantity of drugs

**that happens to be involved in the crimes for which they are convicted.**

**One hypothetical defense of the quantity-based regime would be that the quantity of drugs involved in an offense is a proxy for the offender's role in the drug trade hierarchy.[9] Granted, this may be true in many cases. But in many others, it is not. As the Commission admits, "the quantity of drugs involved in an offense is not as closely related to the offender's function in the offense as perhaps Congress expected" when it passed the 1986 Act, on which the drug trafficking Guidelines are based.** *Mandatory Minimum Report*, **at 350. The Commission's own study found that for every function--ranging from suppliers and importers to lower-level functions such as couriers and mules--the "quantity of drugs involved in the offense on average resulted in a median base-offense level that included or**

---

**9.** *See* **United States Sentencing Commission,** *Mandatory Minimum Penalties for Drug Offenses in the Federal Criminal Justice System*, **at 11 (2017) (noting that, under the 1986 Act, "Drug quantity would serve as a proxy to identify" serious and major traffickers).**

exceeded the five-year mandatory minimum penalty" that Congress originally intended for "serious" dealers. *Id.* at 350-51; *see also* United States Department of Justice, *An Analysis of Non-Violent Drug Offenders with Minimal Criminal Histories*, at 12 (1994) ("Regardless of the functional role a defendant played in the drug scheme, the drug amounts involved in the offense are similar across the roles.").

Consider the case of *Cabrera*, where a "delivery man" got caught in a government sting holding a bag with 14 kilograms of cocaine. 567 F. Supp. 2d at 272. Cabrera "hardly fit[] the profile of a major drug dealer." *Id.* He was told to pick up drugs from undercover government agents. *See id.* At the time, "he was homeless, living out of his car; he had little or no idea about what was going on in the drug deal; he had no role in negotiating it, no money with him at the time of the sting, and was not remotely capable of investing in this drug transaction, or for that matter, any other." *Id*. Cabrera was to receive about $ 250 to $ 500, far less than the

drugs' value. *See id.* "The real purchasers got away" and "Cabrera was caught--quite literally--holding the bag*." Id.* Yet, despite these circumstances, the quantity of drugs involved in the transaction drove the base-offense level all the way up to 32. *See id.* at 275.

Judge Gertner granted a significant downward variance, reasoning that, if she followed the Guidelines and sentenced Cabrera solely based on the quantity of drugs, "the result would be a classic case of false uniformity*." Id.* at 273*.* False uniformity, she explained, "occurs when we treat equally individuals who are not remotely equal because we permit a single consideration, like drug quantity, to mask other important factors*." Id.* In other words, the Guidelines' focus on drug quantity "treats as similar the drug dealers who stood to gain a substantial profit, here the purchasers who escaped, and the deliveryman, Cabrera, who received little more than piecework wages*." Id*.

*Cabrera* is thus a prime example of drug quantity *not* functioning as an accurate proxy for the defendant's role

in the offense, and more generally, his culpability. *See id.* at 277 ("In this case, drug quantity most assuredly is not an accurate proxy" for culpability).

*Cabrera* also serves to rebut a second hypothetical defense of the quantity-based drug sentencing regime: namely, the notion that the Guidelines adequately consider the offender's role through mitigating role adjustments. USSG §§ 3B1.1 and 3B1.2 allow for the offender's offense level to be increased or decreased by between two and four levels if he had an aggravating or mitigating role in the crime. Judge Gertner assigned Cabrera a four-level "minimal role" downward adjustment pursuant to USSG § 3B1.2(a). *See id.* at 278. The application of the mitigating role adjustment triggered the mitigating role cap for drug crimes pursuant to USSG § 2D1.1(a)(5), which further lowered the offense level by two levels. Accordingly, Cabrera's offense level of 32 decreased by a total of six levels based on his mitigating role. Subtracting an additional three levels for acceptance of responsibility, and two for meeting the

25

criteria of the safety valve, his total-offense level was 21. *See id.* Combined with a criminal-history category I, the Guidelines range was 37-46 months of prison. *See id.* Nonetheless, Judge Gertner still concluded that the 18 U.S.C. § 3553(a) factors required a downward variance to a sentence of 24 months. *See id.* at 278-79. In other words, even with the adjustments for Cabrera's mitigating role, the sentence needed to be further reduced by about a *third* of the low end of the Guidelines range. The sentence calculation in Cabrera's particular case thus illustrated Judge Gertner's broader observation that the deductions for a defendant's minor role available in the Guidelines "are limited and do not come close to offsetting the high quantity-driven base offense level." *Id.* at 272-73.

Similarly, in *Diaz*, Judge Gleeson also observed that the "Guidelines take role into account, but not nearly enough." 2013 WL 322243, at *13. He reasoned that the mitigating and aggravating role adjustments under USSG §§ 3B1.1 and 3B1.2 allow for only up to eight levels of

26

differentiation. *See id.* at *13. This pales in comparison to the up to 32 levels of differentiation among defenders based on drug quantity enshrined by USSG § 2D1.1(c), even when you add the additional reduction in levels permitted under the mitigating role cap in USSG § 2D1.1(a)(5). *Id.* A defendant convicted of heroin distribution with no criminal history or applicable adjustments could receive a Guidelines sentence ranging from 10 to 293 months, depending solely on the drug quantity. *See id.* Ultimately, Judge Gleeson called for the sentencing ranges in all drug-trafficking cases to be lowered by a third due to the policy flaws in the quantity-driven scheme. *Id.* at 2.

The bottom line is that drug quantity does not always correspond with a defendant's role or culpability, and this problem is not sufficiently offset by the Guidelines' downward adjustments for mitigating roles. This court therefore agrees with other courts that the drug-trafficking guidelines suffer from an "over-emphasis on quantity" and "under-emphasis on role

in the offense." *Cabrera*, 567 F. Supp. 2d at 275; *see also Hayes*, 948 F. Supp. 2d at 1027 ("The methamphetamine offense Guidelines are excessive because they subject all defendants to harsh treatment, regardless of their role in the offense."); *Diaz*, 2013 WL 322243, at *2 (recommending that the drug trafficking Guidelines be "more sensitive to factors directly relevant to culpability, including the defendant's role in the offense, and less sensitive to drug type and quantity"). Accordingly, the court varied downward based on this policy disagreement.

## ii. Purity

The Guidelines refer to three categories of methamphetamine for purposes of determining the quantity of the drug: methamphetamine "mixture," "actual" methamphetamine," and "Ice." *See* USSG § 2D1.1(c), Notes B-C. Actual methamphetamine refers to "the weight of the controlled substance, itself, contained in the" methamphetamine mixture. USSG § 2D1.1(c), Note B. For

instance, a methamphetamine mixture weighing 10 grams with 50 % purity contains five grams of actual methamphetamine. *See id.* Ice refers to a mixture "containing d-methamphetamine hydrochloride of at least 80 % purity." *Id.* at USSG § 2D1.1(c), Note C.

Each base-offense level in § 2D1.1(c) corresponds to a range of weights of methamphetamine mixture, actual methamphetamine, and ice. Importantly, the Guidelines treat one gram of actual methamphetamine or "ice" as ten grams of methamphetamine mixture. *See* USSG § 2D1.1(c). For example, the base-offense level is 14 for offenses involving, on the one hand, at least five grams but less than 10 grams of methamphetamine mixture, or on the other, at least 500 milligrams but less than one gram of actual methamphetamine or ice. *See* USSG § 2D1.1(c)(13).

Courts must apply the base-offense level as determined by the weight of the methamphetamine mixture or actual methamphetamine within the mixture, whichever results in the highest base-offense level. *See* USSG § 2D1.1(c) Note B. If the mixture is more than 80 % pure

and thus qualifies as ice, the weight of the entire mixture is treated as if it were 100 % pure, and thus all actual methamphetamine.

To illustrate the 10-to-1 ratio between methamphetamine mixture and actual methamphetamine or ice, consider Defendants A and B. Each of them was convicted of distributing a packet containing four grams of methamphetamine mixture. While Defendant A's packet had 75 % purity (meaning three grams of actual methamphetamine), Defendant B's had 40 % purity (meaning 1.6 grams of actual methamphetamine). Because of the higher purity, Defendant A would have a base-offense level of 20, *see* USSG § 2D1.1(c)(10) (applying where actual methamphetamine is at least three grams but less than four), but Defendant B would have a base-offense level of 16, *see* USSG § 2D1.1(c)(12) (applying where the actual methamphetamine is at least one1 gram but less than two), even though the mixtures weighed the same. *See* USSG § 2D1.1(c).

The apparent theory underpinning higher punishments for higher purity methamphetamine is that purity reflects the offender's role in the drug-distribution chain. *See* USSG § 2D1.1, cmt. n. 27(C). Specifically, the Guidelines explain: "Since controlled substances are often diluted and combined with other substances as they pass down the chain of distribution, the fact that a defendant is in possession of unusually pure narcotics may indicate a prominent role in the criminal enterprise and proximity to the source of the drugs." *Id.; see Ibarra-Sandoval*, 265 F. Supp. 3d at 1255 (recognizing the language in § 2D1.1, cmt. n.27(C) as setting forth the "underlying theory" behind increasing sentences based on drug purity).[10]

---

10. USSG § 2D1.1, cmt. n.27(C) explains that, while drugs such as methamphetamine and PCP have a consideration of purity built into their applicable guidelines, other drugs that do not, such as heroin, may warrant an upward departure if they are of unusually high purity. As stated by Judge Bennett, "There is no explanation, however, even in this comment, for why PCP, amphetamine, methamphetamine, hydrocodone, and oxycodone should be distinguished from other drugs, such as heroin, by addressing purity in the applicable Guideline itself, rather than in an upward departure." *Nawanna*, 321 F. Supp. 3d at 951 n.6.

31

However, just as courts have criticized the link between drug quantity and the offender's role, they have also debunked the Guidelines' assumed connection between drug *purity* and criminal role. In *Ibarra-Sandoval*, for example, Judge Brack wrote that the assumed purity-role connection is "divorced from reality." 265 F. Supp. 3d at 1255. He explained that Mexican cartels' increased control over methamphetamine distribution had dramatically increased the national average purity of methamphetamine. *Id.* The opinion cited Drug Enforcement Agency (DEA) statistics showing that the mean national purity grew from as low as 38.7 % in 2007, to as high as 94 % by 2013. *Id.* (citing Drug Enforcement Agency, *2013 National Level STRIDE Price and Purity Data*, at 4 (2015)). Given that the Guidelines treat actual methamphetamine and ice more harshly than methamphetamine mixture, the national average of more than 90 % purity "mean[t] that the sentencing Guidelines would treat the average individual convicted of a crime involving methamphetamine as a kingpin or leader, even though that

simply is not true." *Id.* at 1255-56. In other words, the high purity of methamphetamine in a specific case does not reliably indicate the offender's role in the drug trade, given that methamphetamine throughout the U.S. market is highly pure.

"Case in point" was Ibarra-Sandoval, who was caught with 98.1 % pure methamphetamine. *Id.* at 1256. He was a "low-level courier who didn't even know the contents of the bag he carried except that they contained drugs." *Id.* The high drug purity therefore did not actually reflect his role in the offense or culpability. Applying the purity enhancement would engage in "false uniformity by allowing a single consideration, drug purity, to mask Mr. Ibarra-Sandoval's true role in the crime." *Id.* Based on this policy disagreement, the court varied downward by applying the guideline range for methamphetamine mixtures, instead of actual methamphetamine or ice. *See id.*

While the most recent drug-purity statistics cited in *Ibarra-Sandoval* were from 2013, a May 2018 opinion by

Judge Bennett shows that methamphetamine purity in the U.S. remains high, and thus that Judge Brack's policy critique remains applicable: "[B]ecause today's methamphetamine is substantially pure, purity is not a proxy for relative culpability." *See Nawanna*, 321 F. Supp. 3d at 951. There, Judge Bennett cited a 2017 DEA report stating that, from 2011 to 2016, "the average purity of one gram of methamphetamine has ranged from a low of 85.5 percent in early 2011 to almost 95 percent in early 2014, and most recently, for the third quarter of 2016, averaged 93.5 percent pure." *Id.* (citing Drug Enforcement Agency, *2017 National Drug Threat Assessment*, at 70 (2017)).[11] Based on these statistics showing continued high purity, and other data illustrating the harshness of sentences for methamphetamine offenses,[12]

_____

11. A July 2018 DEA report, covering data from as late as 2016, states that methamphetamine purity "remains at record highs" and that the average purity in the last quarter of 2016 was 94.0 %. *See* Drug Enforcement Agency, *2016 National Drug Price and Purity Data*, at 3-4 (2018), https://ndews.umd.edu/sites/ndews.umd.edu/files/dea-2016-national-drug-price-purity-data.pdf.

12. Judge Bennett noted, for instance, that the "average and median length of imprisonment for

Judge Bennett agreed with Judge Brack that "the Commission's assumption regarding the connection between methamphetamine purity and criminal role is divorced from reality." *Id.* at 954 (quoting *Ibarra-Sandoval*, 265 F. Supp. 3d at 1255); *see also United States v. Hartle*, 2017 WL 2608221, at *1 (D. Idaho June 15, 2017) (Winmill, C.J.) ("Due to increases in the average purity of methamphetamine sold today, purity is no longer an accurate indicator of a defendant's culpability or role in a drug enterprise. ..."). As Judge Bennett aptly summarized, because high-purity methamphetamine is currently available "at all levels of the distribution chain, virtually all defendants today face enhanced punishment for a factor present in virtually all methamphetamine cases, not enhanced punishment based on

_____

methamphetamine offenders during fiscal year 2017 were 91 months and 72 months, respectively, higher than for any other drug, and a 30 % higher average and a 26.32 % higher median than for heroin (70 months and 57 months, respectively)." *Nawanna*, 321 F. Supp. 3d at 953 (citing United States Sentencing Commission, *2017 Datafile, USSCFY17*, Figure J).

individualized determinations." *Nawanna*, 321 F. Supp. 3d at 954.

In 2018, district courts across the country followed in *Nawanna*'s footsteps. *See United States v. Harry*, 313 F. Supp. 3d 969, 974 (N.D. Iowa 2018) (Strand, C.J.) (incorporating *Nawanna* by reference and rejecting the actual and ice methamphetamine guidelines because "drug purity is not an accurate proxy for culpability" and the "10-to-1 ratio established in the Guidelines is not based on empirical evidence"); *United States v. Saldana*, 2018 U.S. Dist. LEXIS 110790, at \*7-8 (W.D. Mich. July 3, 2018) (Neff, J.) (citing *Nawanna* in finding that the methamphetamine guidelines lack empirical support and are "based on the flawed premise that equates drug purity with a greater role in the offense"); *United States v. Ferguson*, 2018 U.S. Dist. LEXIS 129802, \*7-8 (D. Minn. Aug. 2, 2018) (Tunheim, C.J.) (agreeing with *Nawanna* and *Ibarra-Sandoval* and supporting downward variance with the finding that "methamphetamine purity is no longer a proxy

for, and thus not probative of, the defendant's role or position in the chain of distribution").

During the first sentencing hearing , the question arose as to whether the above-cited opinions applied to Johnson, given that the opinions that specified the purity of the drugs at issue all involved ice, and the methamphetamine packets here were 70 % and 73 % pure and thus did not qualify as ice. The court found that the absence of ice here does not meaningfully distinguish the cases. The opinions' critiques of punishing purity apply with equal force to offenders like Johnson, whose guidelines range was determined by the weight of *actual* methamphetamine. This is because the guidelines for actual methamphetamine and ice both result in higher sentences based on the purity of the drug: One gram of either is equal to 10 grams of methamphetamine mixture.

Admittedly, methamphetamine that is at least 80 % pure and therefore qualifies as ice can receive an even greater sentence increase based on purity, because the Guidelines treat ice "as if it were 100 percent pure

37

methamphetamine." *Nawanna*, 2018 U.S. Dist. LEXIS 72676, at *1 n.2.[13] But even for methamphetamine mixtures that do not qualify as ice, the guidelines for actual methamphetamine still result in higher sentences based on purity. Take Johnson. The two separate bags of methamphetamine mixture weighed a total of 901.1 grams, and based on their 70 % and 73 % purities, amounted to 644.43 grams of actual methamphetamine. The guidelines based on methamphetamine mixture would have resulted in a 30 base-offense level, because 901.1 grams of methamphetamine mixture is "at least 500 G but less than 1.5 KG." USSG § 2D1.1(c)(5). But the guidelines based on actual methamphetamine resulted in a 34 base-offense level, because 644.43 grams of actual methamphetamine is

---

13. That the Guidelines treat all ice as if it were 100 % pure can be illustrated with the example of a packet containing 500 grams of methamphetamine mixture at 80 % purity. The weight of actual methamphetamine is 400 grams (500 x .8), which would trigger a 12 base-offense level. *See* USSG § 2D1.1(c)(14). However, because the mixture is 80 % pure, all 500 grams in the packet are considered ice. And 500 grams of ice--just like 500 grams of actual methamphetamine--triggers a 14 base-offense level. *See* USSG § 2D1.1(c)(13). So the 80 % pure methamphetamine is treated as if it were actually 100 % pure.

"at least 500 G but less than 1.5 KG." USSG § 2D1.1(c)(3). As we can see, the policy criticisms outlined in the above-cited opinions apply to cases like Johnson's, which do not involve ice, because the guidelines' 10-to-1 ratio still led him to receive a higher base-offense level due to the purity of the methamphetamine involved in the crimes.

In sum, this court joins other district courts in rejecting the methamphetamine guidelines' 10-to-1 ratio because it is "based on a flawed assumption that methamphetamine purity is a proxy for role in the offense." *Nawanna*, 321 F. Supp. 3d at 955.

## C. Application

To determine Johnson's sentence, the court began "by correctly calculating the applicable Guidelines range." *Gall v. United States*, 552 U.S. 38, 49 (2007). As discussed above, the total weight of the actual methamphetamine was 644.43 grams, resulting in a base-offense level of 34. *See* USSG § 2D1.1(c)(3). The court

39

**subtracted two levels based on Johnson's acceptance of responsibility.** *See* **USSG § 3E1.1(a).[14] Because the court found that he qualified for the safety valve pursuant to 18 U.S.C. § 3553(f)(1)-(5), the offense level was decreased by an additional two levels.[15] Accordingly,**

---

**14. The government did not move to subtract one additional level under § 3E1.1(b).**

**15. USSG § 2D1.1(b)(18) provides that, if "the defendant meets the criteria set forth" in USSG § 5C1.2(a)(1)-(5), "decrease by two levels." USSG § 5C1.2(a)(1)-(5), in turn, sets forth the statutory criteria for safety valve relief under 18 U.S.C. § 3553(f)(1)-(5). Because the most current version of the Guidelines incorporates only those amendments effective by November 1, 2018, the statutory criteria set forth in USSG § 5C1.2(a)(1)-(5) do not reflect amendments made by the First Step Act, which was signed into law on December 21, 2018. Accordingly, subsection (a)(1) of the Guidelines provision states that the defendant cannot have more than one criminal-history point, even though the First Step Act increased the cap to four criminal-history points, thereby making Johnson eligible for safety valve relief. The court found that USSG § 5C1.2(a)(1)-(5) is intended to reflect the statutory criteria in 18 U.S.C. § 3553(f), and that the First Step Act amendments to 18 U.S.C. § 3553(f) are therefore incorporated into USSG § 5C1.2(a)(1)-(5), even though the text of the Guidelines has not yet been updated. Accordingly, Johnson meets the criteria in USSG § 5C1.2(a)(1)-(5), and thus qualifies for a reduction of two levels pursuant to USSG § 2D1.1(b)(18). Alternatively, the court holds that he is entitled to a two-level downward variance to reflect Congressional intent to make Johnson eligible for the safety valve.**

his offense level under the Guidelines was 30. Combined with a criminal-history category of II, his Guidelines range was 108-135 months.

The government argued that the analysis should end here, with Johnson receiving a sentence within the 108 to 135 months range. Notably, the government never objected to Johnson's policy criticisms of the methamphetamine guidelines; it never, for instance, argued that the guidelines are based on empirical evidence or that quantity or purity are in fact reliable proxies for culpability.[16] The government in no way argued at sentencing that the methamphetamine guidelines reflect sound policy. Instead, the government invoked an unpublished opinion by this court to contend that a downward variance was inappropriate because Johnson had "not demonstrated how criticism of the guidelines based on policy disagreement now circulating in other courts applie[d] to his case." Government Sentencing Memorandum

_____

16. *See* also Government Sentencing Memorandum (doc. no. 175).

41

(doc. no. 175) at 4 (quoting *United States v. Trejo*, 2:14-cr00023-MHT, (doc. no. 242) at 3 (M.D. Ala. Jan. 9, 2015) (Thompson, J.)). Essentially, the government contended that, because Johnson's role was higher than that of a "simple, down on his luck one time, 'mule,'" the policy critiques of the methamphetamine Guidelines do not apply to him. *Id.*

The government's argument is at odds with cases indicating that sentencing judges have the authority to categorically vary downward based on policy disagreements with the Guidelines, regardless of the individual circumstances of the case. *See, e.g.*, *Saldana*, 2018 U.S. Dist. LEXIS 110790, at *11 (adopting a blanket "methodology for sentencing in methamphetamine cases" that treats all methamphetamine quantities as mixtures). In *United States v. Beiermann*, for example, Judge Bennett held that the child pornography guideline, USSG § 2G2.2, "should be rejected on categorical, policy grounds, even in mine-run case, and not simply based on an individualized determination that it yields an excessive

sentence in a particular case." 599 F. Supp. 2d 1087, 1104 (N.D. Iowa 2009) (internal quotation marks omitted). Judge Bennett cited *Spears v. United States* as the basis for his authority to reject categorically the child pornography guideline. 555 U.S. 261 (2009). There, the Supreme Court clarified that "district courts are entitled to reject and vary categorically from the crack cocaine Guidelines based on a policy disagreement" with them, *id.* at 265-66, and "not simply based on an individualized determination that they yield an excessive sentence in a particular case," *Id.* at 264.[17] Although *Spears* addressed only the 100-to-1 crack-to-powder ratio, the "powerful implication of *Spears* is that, in other mine-run situations, the sentencing court may also reject guidelines provisions on categorical, policy grounds--

---

17. In *Spears*, the Court noted that the dissent in the Eighth Circuit's *Spears II* decision correctly interpreted *Kimbrough* when it stated that "[t]he only fact necessary to justify such a variance is the sentencing court's disagreement with the guidelines--its policy view that the 100-to-1 ratio creates an unwarranted disparity." *Id.* at 264 (quoting *Spears v. United States*, 533 F.3d 715, 719 (8th Cir. 2008) (Colloton, J., dissenting)).

particularly where those guidelines provisions do not exemplify the Commission's exercise of its characteristic institutional role." *Beiermann*, 599 F. Supp. 2d at 1096 (internal quotation marks omitted); *see also United States v. Lente*, 323 Fed. App'x 698, 713-14 (10th Cir. 2009) (unpublished), *abrogated on other grounds by United States v. Story*, 635 F.3d 1241 (10th Cir. 2011) ("[W]e need not decide whether the district court fashioned an individualized, case-specific sentence, or whether it adopted a categorical policy disagreement with the Guidelines; either way, in light of *Spears,* the district court's policy disagreement was legally authorized.").

While the *Beiermann* opinion is persuasive, this court need not resolve whether it has the authority to categorically reject the methamphetamine guidelines on policy grounds in *all* methamphetamine cases. That is because here, there is a tight fit between the policy criticisms of the methamphetamine Guidelines, and Johnson's individual circumstances. The crux of those criticisms is that the Guidelines overemphasize drug

quantity and purity, which are not always accurate proxies for the defendant's role or culpability; and, at the same time, the Guidelines underemphasize the defendant's role, which is more useful for assessing culpability. These critiques squarely apply to Johnson's guidelines range, because he had a relatively low-level role in the illegal drug activity here.[18]

As detailed above in the background section, Johnson's role was somewhere between a courier and broker or middleman. The "courier" and "broker" roles are the seventh and eighth lowest out of the Sentencing Commission's nine categories of "offender functions,"

_____

18. Indeed, the government never disputed that, for purposes of qualifying for the safety valve, Johnson was "not an organizer, leader, manager, or supervisor of others in the offense ... and was not engaged in a continuing criminal enterprise." 18 U.S.C. § 3553(f)(4). Furthermore, the government admitted that Johnson's case is "far" less "serious and egregious" than in *Trejo*, where the defendant "was operating a methamphetamine distribution operation from Kilby State Prison where he was serving a 99 year sentence for drug related murder." Government Sentencing Memo (doc. no. 175) at 4.

which decrease in culpability. *Mandatory Minimum Report*, at 166-67.[19]

Notably, even though Johnson falls into the bottom third of the Sentencing Commission's spectrum of offender roles, the Guidelines' emphasis on the quantity and

19. The categories, in decreasing order of culpability, are: "[1] High-Level Suppl[i]er/Importer: Imports or supplies large quantities of drugs (one kilogram or more); is near the top of the distribution chain; has ownership interest in the drugs; usually supplies drugs to other drug distributors and generally does not deal in retail amounts. [2] Organizer/Leader: Organizes or leads a drug distribution organization; has the largest share of the profits; possesses the most decision-making authority. [3] Grower/Manufacturer: Cultivates or manufactures a controlled substance and is the principal owner of the drugs. [4] Wholesaler: Sells more than retail/user-level quantities (more than one ounce) in a single transaction, purchases two or more ounces in a single transaction, or possesses two ounces or more on a single occasion, or sells any amount to another dealer for resale. [5] Manager/Supervisor: Takes instruction from higher-level individual and manages a significant portion of drug business or supervises at least one other co-participant but has limited authority. [6] Street-Level Dealer: Distributes retail quantities (less than one ounce) directly to users. [7] Broker/Steerer: Arranges for drug sales by directing potential buyers to potential sellers. [8] Courier: Transports or carries drugs using a vehicle or other equipment. [9] Mule: Transports or carries drugs internally or on his or her person." *Id.*

purity of the drugs led him to receive the third highest out of the 14 possible base-offense levels for methamphetamine crimes.[20]  He therefore exemplifies how the policy flaws identified in this opinion can result in a Guidelines sentence that is greater than necessary under the 18 U.S.C. § 3553(a) sentencing factors. Accordingly, the government's contention that the policy critiques do not apply to Johnson's case were meritless; a downward variance based on policy objections was warranted here.

The next question before the court was how to calculate the magnitude of the downward variance based on the policy disagreements with the methamphetamine guidelines.  District courts have taken diverse approaches to this question.  *See Saldana*, 2018 U.S. Dist. LEXIS 110790, at *10-11 (discussing different approaches).  Some courts have held that, because of their excessive emphasis on quantity, Guidelines ranges

---

**20. There are 14 different base-offense levels for methamphetamine crimes, ranging from 12 to 38; his base-offense level was 34.  *See* USSG § 2D1.1(c)(1)-(14).**

for all drug trafficking cases should be categorically reduced by a third. *See, e.g.*, *Diaz*, 2013 WL 322243, at *18; *see also Hayes*, 948 F. Supp. 2d at 1031 (adopting a one-third reduction for methamphetamine offenses and reserving right to adjust upward or downward based on 18 U.S.C. § 3553(a) factors, including whether quantity was an accurate proxy for culpability). In other cases focused on the *purity* policy disagreement, courts have re-calculated the base-offense level by treating all methamphetamine attributable to the defendant as methamphetamine mixture. *See Nawanna*, 321 F. Supp. 3d at 956 (straying from the one-third reduction adopted in *Hayes*, because, unlike in *Hayes*, the variance was based on the purity-policy disagreement, and Nawanna was not "merely a low-level, generally non-violent addict dealer"); *Ibarra-Sandoval*, 265 F. Supp. 3d at 1256 (concluding that the purity enhancement was unwarranted in the specific case at issue and therefore imposing a sentence within the methamphetamine-mixture range); *Saldana*, 2018 U.S. Dist. LEXIS 110790, at *11.

This court decided to implement the downward variance in two steps, each of which corresponds to the policy disagreements with the overemphasis on purity and quantity, respectively. First, as to the purity critique, the court joined other courts in re-calculating the base-offense level by using the methamphetamine-mixture guideline, instead of the actual methamphetamine Guideline. Eradicating the distinction between actual methamphetamine and methamphetamine mixture appropriately corrects for the Guidelines' unfounded penalization of purity. In application, Johnson's offense involved 901.1 grams of methamphetamine mixture, resulting in a base-offense level of 30. *See* USSG § 2D1.1(c)(5). So, the downward variance related to purity decreased his base-offense level by four levels, from 34 to 30.

The second step, related to the quantity critique, was to reduce the offense level by an additional two levels. This reduction was necessary to offset the excessive significance that the drug-trafficking

**49**

guidelines assign to the quantity of drugs, which do not always--and do not here--reflect the offender's role, and thus culpability. The court notes that, had Johnson actually been just a mule--transporting drugs on his person--a greater reduction may have been necessary to offset the weight the Guidelines give to quantity. Accordingly, the downward variance based on the quantity critique reduced lowered offense level to 28.

Finally, to complete the alternative Guidelines calculation incorporating the above-described variances, the court subtracted an additional four levels for the application of the safety valve, *see* USSG § 2D1.1(b)(18) (subtracting two levels), and Johnson's acceptance of responsibility, *see* USSG § 3E1.1(a) (subtracting two levels). The offense level thereby decreased to 24. The offense level of 24, combined with a category II criminal history, resulted in a Guidelines range of 57 to 71 months.[21]

_____

21. The court denied Johnson's motions to further vary downward based on his personal circumstances or his disagreement with the government's decision to not move

Ultimately, the court imposed a sentence of 64 months in prison--right in middle of the 57-71 months range--to be followed by three years of supervised release. The sentence is slightly higher than the 61 months that Johnson's co-defendant Walker received for his methamphetamine conviction, in order to reflect certain differences in their cases. All told, downward variances based on policy disagreements with the methamphetamine guidelines resulted in a 64-month sentence, instead of a sentence within the applicable guidelines range of 108 to 135 months.

DONE, this the 9th day of May, 2019.

/s/ Myron H. Thompson
UNITED STATES DISTRICT JUDGE

for a reduction by a third level for acceptance of responsibility pursuant to USSG § 3E1.1(b).